HERRICK, FEINSTEIN LLP
*Proposed Attorneys for the Debtor and Debtor in Possession*
Joshua J. Angel
Frederick E. Schmidt, Jr.
Seth F. Kornbluth
Justin B. Singer
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
jangel@herrick.com
eschmidt@herrick.com
skornbluth@herrick.com
jsinger@herrick.com

Hearing Date: November __, 2010
at __:__ _.m

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re                                                                      Chapter 11

THE GLAZIER GROUP, INC.,                            Case No. 10-_____ ( )

        Debtor.
------------------------------------------------------x

## APPLICATION OF THE GLAZIER GROUP, INC. FOR (1) AN INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL; (2) SCHEDULING A HEARING TO CONSIDER THE ENTRY OF A FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL; AND (3) ENTRY OF A FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL

The Glazier Group, Inc. ("GGI" or the "Debtor"), as debtor and debtor-in-possession, as and for their application (this "Application") for authorization to use cash collateral respectfully represents:

      1.     This Application is brought pursuant to Sections 361, 363(c)(2)(3) and 363(e) of the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code"), and Rules 4001(b) and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for

authorization by the Debtors to use "cash collateral", as that term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral").

2. The Debtor requests, in accordance with Rule 4001 of the Bankruptcy Rules, that the Court first conduct an emergency preliminary hearing authorizing its immediate use of Cash Collateral, in accordance with the terms of an interim order substantially in the form annexed hereto as **Exhibit "A"** (the "Interim Order"), and that the Court schedule, and thereafter conduct, a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") authorizing more permanent use of Cash Collateral on terms substantially similar to those set forth in the Interim Order.

3. The Cash Collateral which the Debtor seeks to use is either cash or the cash proceeds of collateral subject to liens and security interests in favor of General Electric Capital Corporation ("GECC" or "Lender") which made prepetition secured loans to the Debtor and certain of the Debtor's affiliates (collectively, the "Borrowers"). The outstanding obligations to GECC total approximately $5.8 million.[1]

4. The Debtor's assets consist of, *inter alia*, accounts receivable and management fees in an amount presently unknown, but in any event less than $5.8 million.

5. Notwithstanding the Lender's anticipated objection to the use of Cash Collateral, the Debtor submits, and will demonstrate in more detail below, that it can adequately protect the Lender from any diminution in its collateral caused by the Debtor's use of its Cash Collateral.

---

[1] By letter dated November 10, 2010, GECC claims the outstanding balance of the loan is $5,823,869.05. The Debtor reserves the right to contest this calculation.

6. Use of Cash Collateral, over the objection of the Lender, is appropriate and within the Debtor's legal rights since GECC will receive replacement liens and adequate protection payments (which payments will reduce the principal of GECC's secured claim) under the terms of the proposed Interim Order and Final Order. The Debtor projects that it will generate net cash flow of approximately $238,547 in the first 30 days of this case.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this Application and the Application is a core proceeding pursuant to 28 U.S.C. §§157 and 1334.

8. Venue of the motion is proper pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

9. The Debtor is a privately owned corporation that provides restaurant management and support services to certain affiliates (the "Affiliates"). The Debtor's principal office is located in New York, New York.

10. Pursuant to certain management agreements with the Affiliates (the "Management Agreements"), the Debtor provides management and support services including but not limited to accounting, human resources, purchasing, public relations, maintenance, culinary and executive management to the Affiliates. Receipts from the Affiliates' restaurant operations, both credit cards and cash, are either directly deposited, or swept into a central Debtor bank account upon receipt. The monies are then utilized to pay the expenses of the individual restaurants such as payroll.

11. Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the Affidavit of Peter Glazier Pursuant to Local Rule 1007-2 (the "Glazier Affidavit").

**The Loan Transactions**

12. The loan transactions under which the Debtor and certain of its Affiliates obtained secured financing from GECC are manifested in the various loan documents (the "Loan Documents") annexed hereto as **Exhibit "B"**.

13. On September 19, 2007, GECC made a joint and several partially collateralized loan, as modified on May 12, 2009 and July 1, 2009, to the Debtor and the Affiliates. The loan, which was originally in the amount of Seven Million Dollars ($7,000,000.00), currently has an unpaid balance of approximately $5.8 million (the "Loan" or the "GECC Debt"). The GECC Debt is secured certain collateral as defined in the Loan Documents.[2] Notably, GECC does not have a properly perfected valid security interest against any of the Debtor's or the Affiliates' leasehold interests or bank accounts. Moreover, the combined balance sheet of the Debtor and the Affiliates as of December 31, 2006 (which was attached to the loan closing binder) reveals that the Debtor and its

---

2 Pursuant to the Loan Documents, "collateral" is defined as all of the following described property, whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible Collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith: All of Borrower's right, title, and interest in: (a) all types of property included within the term "equipment" as defined by the UCC (except vehicles, boats and airplanes), including machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment; (b) all inventory, including all goods held for sale, raw materials, work in process and materials or supplies used or consumed in Borrower's business; (c) all documents; general intangibles; accounts; contract rights; chattel paper and instruments; money; securities; investments properties; deposit accounts; supporting obligations; letters of credit and letter of credit rights; commercial tort claims; and records, software and information contained in computer media (such as data bases, source and object codes and information therein), together with any equipment and software to create, utilize, maintain or process any such records or data on electronic media; (d) any and all plans and specifications, designs, drawings and other matters prepared for any construction on any real property owned by or leased to Borrower or regarding any improvements to any of such real property; and (e) goodwill; *provided, however*, that the security interest in any franchise, license, or distributorship agreement is subject to the provisions of Section 9-408 of the UCC.
HF 6156602v.2 #14758/0001           4

Affiliate were insolvent, on a balance sheet basis, when GECC entered into the loan transaction. Despite the undercollateralization and balance sheet insolvency, the Debtor and Affiliates are current on all interest payments and have reduced the outstanding principal balance of the Loan from $7 million to approximately $5.8 million.

14. The GECC Debt is undersecured.

## RELIEF REQUESTED AND REASONS THEREFOR

15. Using Cash Collateral in which the Lender allegedly has a security interest, even if the Lender should not consent, is the first step in assuring the Debtor's survival.

16. The Loan Documents purport to grant the Lender security interests in, among other things, all "accounts" and the proceeds and products of inventory and other assets. In the ordinary course, the Debtor and its Affiliates operate as a single economic enterprise. The Debtor, pursuant to the Management Agreements with the Affiliates (which the Debtor, by separate application, seeks authorization to assume), pays all payroll-related expenses of the Affiliates, operates and manages, provides marketing and accounting functions for all of the Affiliates. In turn, the Debtor receives a management fee equal to the greater of the actual cost of providing these services for the Affiliates or 3% per month of gross revenues. In order to facilitate this arrangement, VISA and MasterCard credit card payments generated by sales of the Affiliates are deposited directly into the Debtor's Bank of America payroll account (the "BOA Payroll Account") and all credit card payments to any of the Affiliates from American Express are deposited directly into the Debtor's Signature Bank operating account (the "Signature Bank Operating Account"). Under section 363(a) and section 552 of the Bankruptcy Code, these proceeds of Affiliate inventory and accounts

receivable may constitute Cash Collateral and absent the use of this cash in its business, this reorganization, along with the Affiliates' business operations, must necessarily fail.

17. The Debtor cannot continue to operate without the use of Cash Collateral and it requires the use of Cash Collateral to avoid immediate and irreparable harm to its business, its estate and the business of the Affiliates.

18. The need for the cash is best illustrated by the 30-day budget prepared by the Debtor, a copy of which is annexed hereto as **Exhibit "C"**. This budget demonstrates that for the first 30 days of these reorganization proceedings, the Debtor anticipates that it will collect $3,207,000 in cash. During that same time it anticipates cash disbursements of $3,037,178. Of the amount to be disbursed during this period, the largest amount will be for payroll and employee benefit plan obligations of the Debtor and the Affiliates which are projected to be approximately $1,698,982.

19. The Debtor's rent expenses are projected to be approximately $267,756. As this Court is aware, Section 365(d)(3) requires the Debtor to "timely perform" its obligations to pay rent. Without the use of Cash Collateral, the Debtor will be unable to meet these vital obligations.

20. In short, the vast bulk of the monies anticipated to be disbursed by the Debtor over the next 30 days, and until such time as the Court can hold a final hearing, are for rent and labor necessary to maintain the Debtor's business and the business of the Affiliates.

21. There are other items in the budget which are, on the whole, smaller in scale, but are nonetheless necessary and essential if the Debtor is to maintain a healthy, viable and ultimately successful business.

22. Under the Interim Order, the Debtor would be authorized, pending a final hearing, to use Cash Collateral in the ordinary course of its business in accordance with the budget annexed hereto as **Exhibit "C"**. The Lender would receive, as adequate protection for the diminution in the value of the Cash Collateral caused by the Debtor's use, replacement liens on and security interests in (to the extent of such diminution) the Debtor's post-petition assets, to the same extent the Lender's existing liens on the Debtor's assets are ultimately found to be valid and perfected, subject to "Carve-Outs" for the fees of the United States Trustee and retained professionals, as more fully set forth in the Interim Order.

23. In addition, the Debtor would also provide monthly adequate protection payments of $5,000.00, which payments shall reduce the principal amount of the GECC Debt.

24. The Debtor submits that through the granting of these replacement liens and the adequate protection payments, the Lender will be more than adequately protected. Indeed, the true danger of diminution of GECC's collateral would be if usage of Cash Collateral would be denied and the Debtor forced to liquidate. It cannot be seriously disputed that the Debtor is worth more alive than dead.

25. The Interim Order also contains a reasonable list of Events of Default. These include dismissal of the case, appointment of a trustee or an examiner with expanded powers, or material breach of the Order. The Interim Order further permits the Debtor, any Creditors' Committee or any other interested party to challenge any pre-petition liens granted to the Lender at any time.

## NOTICE

26. The Debtor shall give notice of the Interim Hearing by serving a notice of the "first day motions" to the 20 largest unsecured creditors and by serving a copy of the full Application with exhibits upon the Office of the United States Trustee (by hand or overnight delivery) and upon counsel to GECC (by hand, overnight delivery or e-mail). The Debtor respectfully submits that the proposed notice is good and sufficient notice and meets the requirements of Rule 4001(b)(1)(C) of the Bankruptcy Rules.

27. The Debtor respectfully requests that the Court enter the Interim Order authorizing the immediate use of Cash Collateral and that the entry of the Interim Order be deemed consistent with and part of a preliminary hearing held in accordance with Rule 4001(b) of the Bankruptcy Rules. The Debtor respectfully submits that it has demonstrated that there is no genuine dispute that the Lender will be adequately protected by the proposed adequate protection payments and by the replacement liens to be granted pursuant to the Interim Order. The Debtor submits that its has demonstrated that entry of the Interim Order is necessary to enhance and preserve the value of the Debtor's business, the assets of the estate and the business operations of the Affiliates. The hearing is required to avoid irreparable harm which will result if the Debtor is unable to pay the Affiliates' employees pursuant to the Management Agreements and continue operating its business in the normal course.

28. Finally, the Debtor requests that the Final Hearing on the use of Cash Collateral be scheduled for a date which is 30 days following the date of entry of the Interim Order or as close thereto as the Court's schedule permits. Notice will be provided in accordance with the Interim Order and Rule 4001(b) or such other notice order as the Court may direct.

29. For the reasons set forth above, and based upon the record including testimony that the court might request, it is respectfully submitted that the grounds for entry of the Interim Order exist and the relief requested is necessary.

Dated: New York, New York
November 15, 2010

        HERRICK, FEINSTEIN LLP
*Proposed Attorneys for the Debtors and Debtors-in-Possession*

By: /s/ Joshua J. Angel
    Joshua J. Angel
    Frederick E. Schmidt
    Seth F. Kornbluth
    Justin B. Singer
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
jangel@herrick.com
eschmidt@herrick.com
skornbluth@herrick.com
jsinger@herrick.com