UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                       Chapter 11

THE GLAZIER GROUP, INC.,                 Case No. 10-16099(ALG)

        Debtor.
--------------------------------------------------------x

**MODIFIED FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO THE MODIFIED FIRST AMENDED PLAN OF REORGANIZATION OF
THE GLAZIER GROUP, INC, UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: New York, NY
September 8, 2011

HERRICK, FEINSTEIN LLP
Joshua J. Angel, Esq.
Frederick E. Schmidt, Esq.
Justin B. Singer, Esq.
2 Park Avenue
New York, New York 10016
(212) 592-1400

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, ANY AND ALL SUPPLEMENTS TO THE PLAN AND THE OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS AND EVENTS LEADING TO THE COMMENCEMENT OF THIS CHAPTER 11 CASE, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND OTHER WRITINGS RELATING TO THE DEBTOR. NO REPRESENTATIONS CONCERNING OR RELATED TO THE DEBTOR, THIS CHAPTER 11 CASE, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO

AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR

OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

        A.      Holders of Claims and Equity Interests Entitled to Vote.........................3

        B.      Voting Procedures....................................................................................3

        C.      Confirmation Hearing ..............................................................................4

II.     OVERVIEW OF THE PLAN AND SUMMARY TREATMENT OF CLAIMS
        AND INTERESTS................................................................................................5

III.    OVERVIEW OF CHAPTER 11 ...........................................................................9

IV.     DESCRIPTION OF THE DEBTOR'S BUSINESS ..............................................10

        A.      Background...............................................................................................10

        B.      Directors and Management of Glazier Holdings, LLC...........................11

        C.      Pre-Petition Capital Structure of the Debtor ..........................................11

        D.      Events Leading to the Filing of the Chapter 11 Case ............................12

        E.      The Structure of the Chapter 11 Case and The Asset Sale ....................13

V.      THE CHAPTER 11 CASE ....................................................................................

        A.      First Day Motions and Orders.................................................................14

        B.      The Official Committee of Unsecured Creditors....................................22

        C.      Disclosure Statement/Plan Confirmation Hearings ...............................23

VI.     SUMMARY OF THE PLAN OF REORGANIZATION.......................................

        A.      Introduction..............................................................................................23

        B.      Classification and Treatment of Administrative Expense Claims, Claims
                and Equity Interests Under the Plan........................................................23

                1.      Unclassified—Administrative Expense Claims.........................26
                2.      Unclassified—Professional Fee Claims.....................................27
                3.      Unclassified—Priority Tax Claims.............................................28
                4.      Unclassified—Priority Non-Tax Claims.....................................28
                5.      Class 1—GECC Claim ...............................................................29
                6.      Class 2—Joint Legacy Claims....................................................29
                7.      Class 3—Unsecured Claims .......................................................30

i

8.    Class 4—Intercompany Claims ................................................30
9.    Class 5—Equity Interests in the Debtor...............................30

C.    Provisions Regarding Corporate Governance and  Management of the
Reorganized Debtor and the Issuance of Membership Interests in Glazier
Holdings, LLC ...........................................................................................31

1.    Directors and Officers of Glazier Holdings, LLC ....................31
2.    Cancellation of Existing Equity Interests ................................31
3.    Transfer of Membership Interests in Restaurant Affiliates to
Glazier Holdings, LLC...............................................................31
4.    Corporate Action........................................................................33

D.    Means of Distributions Under the Plan and Implementation................33

1.    Distribution Provisions ..............................................................33
2.    Cancellation and Surrender of Existing Securities and Agreements .........35
3.    Compensation and Benefit Programs.........................................35

E.    Rights and Obligations of the Disbursing Agent ..................................36

1.    Powers of the Disbursing Agent ...............................................36
2.    Duties of the Disbursing Agent..................................................36

F.    Procedures for Treating Disputed Claims Under the Plan.....................37

1.    Disputed Claims..........................................................................37
2.    No Distributions Pending Allowance ........................................37
3.    Distributions After Allowance ..................................................37
4.    Voting of Claims.........................................................................38

G.    Treatment of Executory Contracts and Unexpired Leases ...................38

1.    Assumed If Not Rejected ...........................................................38
2.    Objection to Assumption ...........................................................39

H.    Conditions Precedent .............................................................................39

1.    Conditions Precedent to Effective Date.....................................39
2.    Waiver of Conditions Precedent to Effective Date....................40
3.    Effect of Failure of Conditions ..................................................40

I.    Effect of Confirmation of the Plan........................................................40

1.    Continued Corporate Existence ..................................................40
2.    Vesting of Assets ........................................................................40
3.    Discharge of the Debtor ..............................................................41
4.    Injunction ...................................................................................42
5.    Extinguishment of Causes of Action Under the Avoiding Power
Provisions....................................................................................43
6.    Votes Solicited In Good Faith.....................................................44
7.    Releases and Related Matters .....................................................44
8.    Exculpation and Limitation of Liability ....................................46
9.    Term of Bankruptcy Injunction or Stays ...................................47

|  |  | 10. | Preservation of Insurance | 47 |
|  |  | 11. | Officers' and Directors' Indemnification Rights and Insurance | 48 |
|  | J. | | Retention of Jurisdiction | 49 |
|  |  | 1. | Scope of Jurisdiction | 49 |
|  | K. | | Miscellaneous Provisions | 50 |
|  |  | 1. | Creditors' Committee | 50 |
|  |  | 2. | Compliance With Tax Requirements | 51 |
|  |  | 3. | Payment of Statutory Fees | 51 |
|  |  | 4. | Pre-Confirmation Modification | 51 |
|  |  | 5. | Post-Confirmation Immaterial Modifications | 51 |
|  |  | 6. | Revocation or Withdrawal of Plan | 52 |
|  |  | 7. | Governing Law | 52 |
|  |  | 8. | Notices | 52 |
|  |  | 9. | Post-Confirmation Date Service List | 53 |
|  |  | 10. | Exemption from Certain Transfer Taxes | 53 |
|  |  | 11. | Filing or Execution of Additional Documents | 53 |
|  |  | 12. | Section 1145 Exemption | 53 |
| VII. | | | CONFIRMATION PROCEDURE | 54 |
|  | A. | | Solicitation of Votes | 54 |
|  | B. | | The Confirmation Hearing | 55 |
|  | C. | | Confirmation | 56 |
|  |  | 1. | Acceptance | 57 |
|  |  | 2. | Feasibility | 57 |
|  |  | 3. | Best Interests Test | 57 |
| VIII. | | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | |
|  | A. | | Liquidation Under Chapter 7 | 60 |
|  | B. | | Alternative Plan of Reorganization | 60 |
| IX. | | | CERTAIN RISK FACTORS TO BE CONSIDERED | |
|  | A. | | Certain Bankruptcy Law Considerations | 62 |
|  |  | 1. | Risk of Non-Confirmation of the Plan | 62 |
|  |  | 2. | Risk of Non-Occurrence of the Effective Date | 62 |
|  | B. | | Certain Tax Matters | 62 |
|  | C. | | Additional Factors to be Considered | 62 |
|  |  | 1. | Risk of Economic Deterioration | 62 |

       2.      The Debtor Has No Duty to Update ........................................63

       3.      No Representations Outside This Disclosure Settlement Are
              Authorized...............................................................................63

       4.      Claims Could Be More Than Projected ....................................63

       5.      Projections and Other Forward-Looking Statements Are Not
              Assured, and Actual Results May Vary ....................................63

       6.      No Legal or Tax Advice is Provided to You By This Disclosure
              Statement.................................................................................64

       7.      No Admission Made ...............................................................64

X.     SECURITIES LAWS MATTERS.........................................................

    A.    Bankruptcy Code Exemptions from Registration Requirements...........64

       1.      Initial Offer and Sale of Plan Securities ..................................64

XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........65

    A.    Consequences to the Debtor....................................................67

    B.    Consequences to Claim Holders ...............................................67

XII.   RECOMMENDATION AND CONCLUSION................................................68

**EXHIBIT A—PLAN**

**EXHIBIT B—DISCLOSURE STATEMENT ORDER**

**EXHIBIT C—PROJECTIONS**

**EXHIBIT D—LIQUIDATION ANALYSIS**

**EXHIBIT E—CURE SCHEDULE**

# I.
## INTRODUCTION

On November 15, 2010 (the "Petition Date"), The Glazier Group, Inc. ("GGI" or the "Debtor") filed a petition for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").  On July 12, 2011, the Debtor filed its proposed plan of reorganization, dated July 12, 2011 (as may be further amended, modified or supplemented, the "Plan")[1], a copy of which is annexed as Exhibit A, which sets forth the manner in which Claims against and Equity Interests in the Debtor will be treated.  On September 7, 2011, the Debtor filed an amendment to the Plan.  This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan (including the treatment of creditor Claims under the Plan), the Debtor's business and related matters.  Unless otherwise defined, all capitalized terms have the meanings ascribed to them in the Plan.

As discussed more fully below, after a careful review of its business and prospects, and after extensive pre-petition and post-petition negotiations, the Debtor, has concluded that recoveries to creditors will be maximized under the Plan, as contrasted with other possible alternatives, including the liquidation and distribution of the Debtor's assets in accordance with the priority scheme provided by the Bankruptcy Code.

This Disclosure Statement is submitted to holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") presently scheduled for October 13, 2011, at 11:00 a.m. Eastern Time.

Attached as Exhibits to this Disclosure Statement are copies of the following:

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan

- The Plan (Exhibit A)

- An Order of the Court dated September 8, 2011 (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

- Projections (Exhibit C);

- The Debtor's Liquidation Analysis (Exhibit D); and

- The Cure Notice (Exhibit E)

In addition, a Ballot for the acceptance or rejection of the Plan is being transmitted with this Disclosure Statement to the holders of Impaired Claims that are entitled to accept or reject the Plan.

On September 8, 2011, after notice and a hearing, the Court approved the Disclosure Statement and determined that the Disclosure Statement contained adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the other Exhibits hereto and the instructions accompanying the Ballot(s) in their entirety before

voting.  These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes.  No solicitation of a vote to accept the Plan may be made without giving the voter a Disclosure Statement approved by the Court.

### A.    Holders of Claims and Equity Interests Entitled to Vote

Only impaired holders of Allowed Claims or Interests are entitled to vote to accept or reject a proposed chapter 11 plan.  Unimpaired Classes are deemed to have accepted the Plan and are not entitled to vote.  Classes of Claims or Interests that will not receive any distribution under a reorganization plan are deemed to have rejected such plan and also are not entitled to vote.

Under the Debtor's Plan, Class 2 (Joint Legacy Claims) and Class 3 (Unsecured Claims) are impaired and entitled to vote on the Plan.  Equity Interests in The Glazier Group, Inc. (Class 5) receive no distributions under the Plan and are therefore deemed to have rejected the Plan. Class 1 (GECC Claim) and Class 4 (Affiliate Claims) are unimpaired and conclusively deemed to have accepted the Plan.

The Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that vote for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Article VIII, "Confirmation Procedures."

### B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for that purpose.  If you hold a Claim or an Interest in more than one Class and you are entitled to vote in more than one Class, you will receive separate Ballots that must be used for each separate Class.

Please vote and return your Ballot(s) directly to the following address:

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Attn: Justin B. Singer

**DO NOT RETURN ANY OTHER INSTRUMENTS OR AGREEMENTS WITH YOUR BALLOT.  TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M., PREVAILING NEW YORK TIME, ON OCTOBER 11, 2011.**

Pursuant to the Disclosure Statement Order, the Court set September 8, 2011, as the record date for voting on the Plan.  Accordingly, the holders of Claims as of September 8, 2011, that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call Herrick, Feinstein LLP, attn: Justin B. Singer, counsel for the Debtor, at (212) 212-592-1400, during regular business hours.

C.    **Confirmation Hearing**

A hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held on October 13, 2011 at 11:00 a.m., Eastern Standard Time, before the Honorable Allan L. Gropper, United States Bankruptcy Judge, at the United State Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.  The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before October 11, 2011, at 5:00 p.m. Prevailing New York Time, in the manner described in the Disclosure Statement Order.  Service of any objection to confirmation must be served upon counsel to the Debtor, Herrick, Feinstein LLP, 2 Park Avenue, New York, New

York 10016, Attn: Joshua J. Angel; counsel to the Creditors' Committee, SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman; counsel to GECC, Reed Smith LLP, 10 South Wacker Drive, 40th Floor, Chicago, Illinois 60606-7507, Attn: Alexander Terras and 599 Lexington Avenue, New York, New York 10022, Attn: Andrea J. Pincus; and the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Richard Morrissey, Esq. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO REORGANIZE SUCCESSFULLY, MAXIMIZE RECOVERIES TO ITS CREDITORS AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11. THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.

## II.
## OVERVIEW OF THE PLAN AND SUMMARY
## TREATMENT OF CLAIMS AND INTERESTS

Prior to the Petition Date, the Debtor was negatively impacted by the general economic downturn and the concomitant reduction in consumer spending which was especially severe in the high-end food industry. Attendant to that downturn the Restaurant Affiliates to which the Debtor provides managerial services experienced a reduction in sales, reduced liquidity and profitability, and being over levered the Debtor and the Restaurant Affiliates were unable to support their combined operations. As a result, five newly opened restaurant facilities were forced to close. Thereafter, the Debtor and its co-borrower Restaurant Affiliates undertook extensive workout negotiations with their secured lender, GECC. In November, 2010, the

Debtor found itself unable to conclude a satisfactory loan restructure with GECC.  This inability gave rise to the Debtor's decision to seek relief under chapter 11 of the Bankruptcy Code.  The Restaurant Affiliates  intentionally did not file their own chapter 11 cases, even though they were each co-borrowers jointly and severally liable under the GECC loan facility.  At the time, it was hoped that GECC would refrain from exercising its rights against the Restaurant Affiliates while the Debtor's Chapter 11 Case progressed so as to ensure the seamless and continued operations of the restaurants.  In the Chapter 11 Case, the Debtor explored all available options and continued to engage in extensive negotiations with GECC hoping to develop a viable, restructuring plan that would allow the Debtor to emerge from Chapter 11 as a viable business entity.  In April, 2011, GECC announced its intention to cause a portion of its collateral, consisting of equity interests in and tangible assets of the Restaurant Affiliates, to be sold pursuant to the Uniform Commercial Code (the "UCC Sales").  The Debtor initially sought an extension of the automatic stay to enjoin the UCC Sales of the Restaurant Affiliate equity interests.  The Court, however, expressed skepticism regarding its ability to enjoin the UCC Sales noting that the Restaurant Affiliate had not joined the Debtor in filing for Chapter 11 relief.  Rather than risk the threatened UCC Sales, the Debtor and the Restaurant Affiliates chose to enter into discussion for the sale of certain Restaurant Affiliate assets in order to pay off the indebtedness to GECC, and provide necessary funding for the Plan.  On July 5, 2011 the Selling Affiliates entered into the binding sale agreement, whereby Striphouse Restaurants, LLC agreed to purchase the Striphouse trademark together with substantially all of the assets of three Selling Affiliates, free and clear of all liens, claims and encumbrances (the "Sale Agreement").  The sale is expected to close in tandem with the Plan Confirmation Date.

The following are the highlights and benefits of the Plan:

- The Plan provides for the reorganization and recapitalization of the Debtor. Under the Plan, the Debtor will be reorganized and emerge from chapter 11 with a de-levered capital structure.

- The Debtor believes that the Plan will enable it to emerge from chapter 11 as a viable business in concert with the remaining Restaurant Affiliates.

- GECC's allowed secured claim shall be paid in full in cash from the proceeds of the Asset Sale.

- Holders of Joint Legacy Claims shall be paid in accordance with the terms set forth in the respective stipulations settling such Claims entered into by and between the Debtor and/or Restaurant Affiliates and each holder of a Joint Legacy Claim.

- Holders of Allowed Unsecured Claims shall receive a cash distribution equal to 20% of the amount of such Claims, payable in two equal installments commencing on the Effective Date, and the final payment to be made within 30 days of the end of calendar year 2011. This recovery is a significantly greater recovery than such creditors would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code (where it is projected that Allowed Unsecured Claims would receive a 0% recovery on account of their Claims).

- Allowed Administrative Claims, Priority Tax Claims and Non-Tax Priority Tax Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed to by the holders of such Claims.

- Old Equity Interests in the Debtor will be cancelled, and holders of Equity Interests will receive no Distributions on account of their Equity Interests under the Plan.

- On the Effective Date, the Equity Holders, as holders of 100% of the membership interests in the Restaurant Affiliates, shall transfer all such membership interests to the reorganized Debtor, Glazier Holdings, LLC. In consideration thereof, and in further consideration of the waiver of distributions on account of claims held by the Restaurant Affiliates, the Equity Holders shall receive new equity interests comprising 100% of the Equity Interests in Glazier Holdings, LLC.

The following briefly summarizes the specific classification and treatment of Claims and

Equity Interests under the Plan.

SUMMARY OF CLASSIFICATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

Unclassified Claims

7

As provided in Article II of the Plan, Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims of the kinds specified in sections 507 of the Bankruptcy Code have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code:

| Class | Type of Claim or Equity Interest | Treatment | Estimated Claim Amount (By Class) | Estimated Recovery |
|---|---|---|---|---|
| 1 | GECC Claim | Unimpaired; in full satisfaction, settlement, release and discharge of the GECC Allowed Claim, GECC shall be paid 100% of its Allowed Claim in Cash. from the proceeds of the Asset Sale on the Confirmation Date. In the event the allocated Cash proceeds of the Asset Sale are insufficient to then pay the Allowed GECC Claim in full, the remaining GECC Claim balance shall be paid in full in Cash on the Plan Effective Date. | $5,800,000 (approximate principal balance as of the Petition Date) | 100% |
| 2 | Joint Legacy Claims | Impaired; in full satisfaction, settlement, release and discharge of each holder's Allowed Joint Legacy Class 2 Claim, the respective stipulations and agreements fixing and settling such Claims shall be assumed by the Debtor on the Confirmation Date and all payment defaults shall be cured thereon, and thereafter each holder of an Allowed Joint Legacy Claim shall be paid in full settlement, release, and discharge thereof in accordance with the terms set forth in the respective stipulations or agreements fixing and settling such Claim. | $325,732 | Per Stipulated Settlement |
| 3 | Unsecured Claim | Impaired; in full satisfaction, settlement, release and discharge of the Debtor's Pre-Petition obligations to each holder of an Allowed Class 3 Unsecured Claim, each holder of an Allowed Unsecured Claim shall receive 20% of such holders' Allowed Claim, payable in two equal installments, with the initial payment to be made as soon as practicable on or after the Effective Date, and the final payment to be made within 30 days of the end of calendar year 2011. | $700,000 | 20% |
| 4 | Affiliate Claims | Affiliate Claims which are not satisfied in connection with the Asset Sale shall be reinstated and each holder of an Allowed Class 4 Affiliate Claim shall agree to forebear exercising any rights and agree not to receive any payment on their claims for a period of three years from the Effective Date. | $13,000,000 | No cash distribution pursuant to the Plan |

| 5 | Equity Interests | Impaired; on the Effective Date, Equity Interests in the Debtor shall be cancelled and the holders of Equity Interests shall receive new equity interests in the Reorganized Debtor representing 100% of all outstanding equity interests. | N/A | 0% |

### III.
### OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of interested parties including its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in

sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtor is submitting this Disclosure Statement to holders of Claims against the Debtor and the Debtor's Equity Interests to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.
## DESCRIPTION OF THE DEBTOR'S BUSINESS

### A.    Background

Pursuant to various management agreements, GGI provides management and support services to the Restaurant Affiliates. GGI's services include, but are not limited to, accounting, human resources, purchasing, public relations, maintenance, culinary and executive management. GGI incorporated in New York in 1996. The non-Debtor Restaurant Affiliates own six high-end steakhouse restaurants, branded as "Strip House", located in New York ("Strip House New York"), New Jersey ("Strip House New Jersey"), Florida ("Strip House Naples" and "Strip House Key West"), Texas ("Strip House Houston") and Nevada ("Strip House Las Vegas"), as well as two catering facilities ("Bridgewaters" and "24 Fifth Avenue"), and a Michael Jordan's steakhouse ("Michael Jordan's"), all located in Manhattan. The Restaurant Affiliates are all wholly-owned by members of the Glazier family in varying percentages. The Debtor manages the Restaurant Affiliates by agreement, but does not own any equity interests in any of the Restaurant Affiliates.

Immediately prior to the onset of the current economic downturn, the Debtor's business underwent rapid growth, with corresponding debt expansion, as three "Strip House" restaurants were opened in 2006, three in 2007 and one in early 2008. As a result of recessionary forces, one of the newly opened Strip House's closed by late 2008, three more closed in the 1st quarter

of 2009, and one more closed in the 2nd quarter of 2010, causing a tremendous strain on the Debtor's liquidity.

### B.    Directors and Management of Glazier Holdings, LLC

Peter H. Glazier, GGI's founder, is the President and Chief Executive Officer of the Debtor.  Mr. Glazier has over 30 years of managerial experience and was part of an executive team that grew "Strip House" into one of the nation's leading brands in the fine dining sector.  In addition to Mr. Glazier, who shall remain as a director of Glazier Holdings, LLC, Mathew Glazier, GGI's President and General Counsel, will remain as a director of Glazier Holdings, LLC, and Penny Glazier, who is currently the head of marketing for the Debtor, will become Secretary of Glazier Holdings, LLC.

### C.    Pre-Petition Capital Structure of the Debtor

The GECC Loan

On September 19, 2007, GECC made a joint and several loan (as modified thereafter, the "GECC Loan") to the Debtor and the Restaurant Affiliates, excluding Strip House Key West, LLC (the "Borrowing Entities") in the amount of $7 million.  The GECC Loan is secured by substantially all of the Debtor and Restaurant Affiliate assets, other than real property leasehold interests, together with their respective membership interests.

As of the Petition Date, the total outstanding obligation under the GECC Loan was approximately $5.8 million.

Business Operations

The Debtor provides restaurant management services for the Restaurant Affiliates pursuant to management agreements with each.  Pursuant to the management agreements with the Restaurant Affiliates, the Debtor receives a management fee equal to the greater of: (i) three

percent (3%) per month, or (ii) the actual cost of providing management services to each of the Restaurant Affiliates.

> **D.      Events Leading to the Filing of the Chapter 11 Case**

As noted above, the restaurant businesses underwent an ill-timed, rapid expansion, with the opening of six new restaurants within the span of two years just before the recession hit in late 2008.    Attendant to the expansion of the business, the Debtor and the co-borrower Restaurant Affiliates consolidated their debt obligations as the Borrowing Entities, jointly and severally, borrowed $7 million from GECC in September 2007.   As of the Petition Date the Loan had been paid down to approximately $5.8 million, and interest on the Loan was current.

The magnitude of the recessionary events of late 2008 which followed the collapse of Lehman Brothers caused a marked decline in the fine dining industry, especially in areas such as New York, Florida and Las Vegas where the Debtor managed as many as eight different high end dining concepts.    The constrained liquidity position of the Debtor and the Restaurant Affiliates at that time coupled with GECC's refusal to further fund the business required that five restaurants be closed within a span of 18 months.   In addition to the total loss of its investment in the five closed restaurants, and the revenue derived therefrom, the recession-mandated rationalization of its business left the Debtor, the Restaurant Affiliates and Peter Glazier, who previously (i.e. post GECC Loan) was not personally obligated for any of the Borrowing Entities debt payment, with the joint responsibility to repay obligations incurred in connection with the closed restaurants of nearly $5 million (the "Legacy Debt")

As it tried to weather the recession storm, the Debtor negotiated two loan modifications with GECC, dated May 12, 2009 and July 1, 2009, in exchange for a pledge of the equity interests of the Borrowing Entities.    GECC in turn agreed to a schedule of interest only

payments.  Between 2008 and 2010, the Debtor paid down the GECC Loan by $1.2 million while it continued to remain current on the Loan interest payments.  During the same time-frame the Debtor retired approximately $2 million of Legacy Debt.

###     E.    The Structure of the Chapter 11 Case and The Asset Sale

In the face of GECC's default notice the Debtor had no choice but to file its chapter 11 petition.  The Restaurant Affiliates intentionally did not file their own chapter 11 cases, even though they were borrowers jointly and severally liable under the GECC loan facility, in the hope that GECC would refrain from attempting to foreclose against the Restaurant Affiliates assets, so as to allow for the seamless and continued operations of the restaurants while the Debtor attempted to reorganize its affairs.

On July 5, 2011 an agreement (the "Sale Agreement") was entered into between Striphouse Restaurants, LLC as buyer, and T-Bone Restaurant LLC, Big Bones Limited Partnership, Big Bones Liquor, Inc., and Strip House Las Vegas, LLC as sellers (collectively, the "Selling Affiliates").   The Sale Agreement provides for the purchase by the buyer of substantially all the tangible and intangible assets of the Selling Affiliates free and clear of all liens, claims and encumbrances for the purchase price of $12.75 million (the "Asset Sale").

In addition to the purchase price of $12.75 million, the following is an outline of the remaining salient terms of the Sale Agreement:

- Buyer will enter into a three-year consulting agreement with Peter H. Glazier which shall provide that in exchange for Mr. Glazier's advice in operating the restaurants, Buyer shall pay Mr. Glazier $175,000 per year

- The non-selling Restaurant Affiliates may continue to use the name "Strip House", subject to a mutually agreed upon license for quality control purposes and a fee of $1.00

- Glazier family members' limited covenants not to compete with the purchased Strip House restaurants, or to hire or solicit any individuals engaged by or performing substantial services for the subject restaurants after March 31, 2011

## V.
## THE CHAPTER 11 CASE

**A.      First Day Motions and Orders**

On the Petition Date, the Debtor filed the following motions (the "First Day Motions")

for which the Debtor sought an expedited "first day" hearing (the "First Day Hearing"):

- Application to Extend Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules Motion");

- Debtor's Application Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for (i) Authorization to Pay Wages, Compensation, and Employee Benefits, and (ii) Authorization of Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Wage Motion");

- Motion for Order Authorizing Maintenance of Pre-Petition Bank Accounts and Continued Use of Existing Business Forms, and Granting Related Relief (the "Cash Management Motion");

- Motion of the Debtor for Entry of an Interim Order Authorizing (I) Assumption of Certain Executory Contracts and (II) Granting Related Relief (the "Management Agreement Assumption Motion");

- Application of The Glazier Group, Inc. For (1) an Interim Order Authorizing Use of Cash Collateral; (2) Scheduling a Hearing to Consider the Entry of a Final Order Authorizing Use of Cash Collateral; and (3) Entry of a Final Order Authorizing Use of Cash Collateral (the "Cash Collateral Motion");

The Debtor also filed the following motions after the commencement of the Chapter 11

Case:

- Application to Employ Herrick, Feinstein LLP as Principal Bankruptcy Counsel (the "Herrick Retention Application");

- Motion for an Order Authorizing the Debtor to Enter into Insurance Premium Finance Agreement (the "Insurance Finance Motion");

- Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) for an Order Authorizing the Retention of John Dunne of Renewal Ventures, LLC Nunc Pro Tunc to February 7, 2011 as Chief Restructuring Officer (the "CRO Application");

- Motion Requesting Entry of an Order Extending the Exclusive Periods to File and Solicit Acceptances of a Plan of Reorganization Pursuant to 11 U.S.C. § 1121(d) for an Additional Ninety (90) Days (the "Exclusivity Motion");

- Debtor's Motion for Entry of an Order Extending Time to Assume or Reject Certain Unexpired Lease of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4) and Rules 6006 and 9006 of The Federal Rules of Bankruptcy Procedure (the "Lease Extension Motion");

- Application for Order Setting Bar Date for Filing Certain Proofs of Claim, Approving Procedures for Filing Such Proofs of Claim and Approving Form and Manner of Notice Thereof (the "Bar Date Application");

- Motion for Sanctions Pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code, and Related Relief (the "Sanctions Motion").

*The Schedules Motion.*  The Debtor requested an extension of thirty (30) days from the Petition Date to file its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules") due to the complexity and diversity of the Debtor's operations and the voluminous nature of the Debtor's books and records.  By Order dated November 18, 2010, the Court granted the Debtor until December 29, 2010 to file its Schedules.

*The Wage Motion..*  As is typical in chapter 11 cases, the Debtor requested authorization to: (i) pay and/or perform, as applicable, pre-petition obligations to their 14 employees (the "Employees"), including accrued pre-petition wages, salaries, and certain employee benefits; (ii) pay all related pre-petition withholdings and payroll-related taxes; (iii) reimburse Employees for pre-petition expenses that they have incurred on behalf of the Debtor in the ordinary course of business; and (iv) continue their employee benefit programs, and pay all fees and costs in connection therewith, including pre-petition amounts (collectively, the "Employee Obligations").

By Order dated November 17, 2010, the Court authorized the Debtor to pay its pre-petition Employee Obligations as well as the payroll obligations of the Restaurant Affiliates.

*The Cash Management Motion.* By Order dated November 18, 2010, the Court authorized the Debtor to (a) continue using its current cash management system, (b) continue using and maintaining existing bank accounts (as well as authorizing the Debtor to open and close bank accounts), and (c) continue using existing business forms.

*Management Agreement Assumption Motion.* Pursuant to the Management Agreement Assumption Motion, the Debtor requested authority to assume the management agreements between the Debtor and the Restaurant Affiliates. The Debtor withdrew this motion at the First Day Hearing.

*The Herrick Retention Application.* By Order of the Court dated January 13, 2011, the Court authorized the retention of Herrick, Feinstein LLP as the Debtor's principal bankruptcy counsel.

*The Insurance Finance Motion.* The Debtor sought authority to enter into an insurance finance agreement in order to finance (i) a package insurance policy issued by American Automobile Insurance Company that covers general property and liability, (ii) an umbrella policy issued by St. Paul Fire & Marine Insurance Company that provides an additional $25 million in liability coverage, and (iii) a workers' compensation insurance policy issued by the Hartford Casualty Insurance Company. By Order dated February 3, 2011, the Court granted the relief sought by the Debtor in the Insurance Finance Motion.

*The CRO Application.* In response to GECC's motion for the appointment of a Chapter 11 Trustee, and the demands of Creditor Committee counsel the Debtor sought authorization to retain John Dunne of Renewal Ventures, LLC ("Ventures") as its Chief Restructuring Officer

("CRO") in the hope that Mr. Dunne's experience and knowledge in assisting troubled restaurant businesses would render GECC and the Creditor Committee less hostile to the Debtors reorganization. In connection with Ventures' retention, the Debtor, the Restaurant Affiliates and Dunne, as the sole member of Ventures, entered into an agreement effective as of February 7, 2011 (the "Agreement"), whereby Dunne would provide professional services to the Debtor and the Restaurant Affiliates, as necessary (the "Services"). The salient terms of the Agreement (as defined therein) are outlined below:

    (a)    During the period commencing on the date hereof Ventures shall review, evaluate and advise the Company in connection with (i) the assets, liabilities, and financial condition of the Company and its operations, (ii) any and all transfers of any assets of the Company or any assets to which any Company has a claim of ownership to any party in interest prior to and/or during the Bankruptcy Case, (iii) potential restructuring alternatives, including but not limited (A) a disposition of assets of the Debtor and/or any of the Affiliates in connection with sales conducted under section 363 of the Bankruptcy Code (a "363 Sale"); (B) other sales, transfers, assignments or dispositions, other than sales in the ordinary course of the Company's business, of assets in whole or in part and through one or more transactions; (C) the completion of the Debtor's reorganization in the Bankruptcy Case or any other sale, reorganization, reconstitution or recapitalization of the Debtor (a "Reorganization") and (vi) any other matters relevant to the Bankruptcy Case and the formulation of a plan of reorganization (the "CRO Investigation").

In consideration for Dunne's Services, the Debtor agreed to pay the following compensation, fees and reimbursable expenses:

    (a)    Commencing on February 7, 2011 through the termination date of this Agreement, compensation at the rate of twenty two thousand nine hundred and sixteen dollars and sixty seven cents ($22,916.67) per month, payable in installments of $11,458.34 in arrears on the first and fifteenth day (or, if such date falls on a non-business day, the first business day following such date) of each month. The first payment shall be pro-rated for the period February 7, 2011 through February 15, 2011 and shall be due on February 15, 2011 (all of the foregoing compensation being referred to herein as the "Base Fee").

(b)      In the event of (i) the confirmation of a plan of reorganization in the Bankruptcy Case (a "Reorganization"); (ii) a sale of all or substantially all of the assets of the Company (whether in a single transaction or a series of transactions) (a "Sale"); (iii) a voluntary dismissal of the Chapter 11 Case ("a "Structured Dismissal"), Ventures, upon approval of the Court, shall be paid a transaction fee in the amount of two hundred thousand dollars ($200,000) (the "Transaction Fee").  In the event of a Sale, the Transaction Fee shall be payable within six days after the completion of the Sale. In the event of a Reorganization or a Structured Dismissal, the timing of payment of the Transaction Fee shall, subject to the provisions of chapter 11 of the Bankruptcy Code, be the subject of further negotiation between the parties.

Pursuant to the Agreement, Ventures' engagement shall automatically terminate upon: (1) confirmation of a plan; (2) the termination, on or before February 28, 2011, of the Debtor's ability to use cash collateral; or (3) conversion of the Bankruptcy Case to one under chapter 7 of the Bankruptcy Code.  Ventures' engagement may also be terminated (i) at any time upon the mutual, unanimous consent of the Debtor and the Committee, (ii) at any time by Ventures after the provision of not less than fifteen (15) days' notice to the Debtor, or (iii) upon entry of a final, non-appealable order by a court of competent jurisdiction approving such termination; provided that any such request for the termination of Ventures' engagement (a "Termination Request") shall be made to the Court, and shall be made on not less than ten (10) days' notice to the Debtor and the Committee (the "Notice Parties"); and provided further that all Notice Parties shall be entitled to oppose any such Termination Request on any and all grounds.  Notwithstanding any termination of the Agreement, the Company shall be fully obligated to pay to Ventures all fees, including Base Fees and Transaction Fee, as well as reimbursable expenses accrued and owed to Ventures through the date of termination.  By Order dated February 16, 2011, the Court authorized Dunne's retention pursuant to the Agreement, and thereafter he performed brilliantly in the discharge of his duties.

18

*The Lease Extension Motion.* In accordance with 11 U.S.C. § 365(d)(4), the Debtor's time to assume or reject its unexpired lease of office space (the "Lease") was to expire on March 16, 2011. Because it was not in the best interests of the Debtor's estate and creditors to make a determination in that time frame, as to whether the Lease should be assumed, assigned or rejected, the Debtor sought the entry of an order extending its time in which to assume or reject the Lease for a period of ninety (90) days through and including June 14, 2011. By Order dated March 15, 2011, the Court granted the Lease Extension Motion and extended the time in which the Debtor could assume or reject the Lease to June 14, 2011.

*The Bar Date Application.* By Order dated March 24, 2011, the Court fixed a Bar Date of May 3, 2011 at 5:00 p.m. (Eastern Standard Time) as the deadline for non-governmental units to file proofs of claim against the Debtor, and fixed a Government Bar Date of May 16, 2011 at 5:00 p.m. (Eastern Standard Time) as the deadline for governmental units to file proofs of claim against the Debtor.

*The Cash Collateral Motion.* The Debtor sought authority to use cash and the cash proceeds of collateral subject to liens and security interest in favor of GECC in connection with the GECC Loan ("Cash Collateral") on a non-consensual basis. By order dated November 18, 2010 (the "First Interim Order"), the Court authorized the Debtor's interim use of Cash Collateral pending a final hearing (the "Final Hearing") to be held before the Court to consider entry of a final cash collateral order authorizing the use of Cash Collateral (the "Final Order"). Pursuant to the First Interim Order, aggregate gross compensation to Peter, Mathew and Penny Glazier was capped at $13,942.31 per week. Further, as adequate protection for any post-petition diminution in value of GECC's collateral, the Court granted GECC a post-petition claim against the Debtor's estate (the "Adequate Protection Claim"). As security for the Adequate Protection

Claim, the Court authorized, and the Debtor did grant, a valid, binding, enforceable and automatically perfected lien, and/or security interest (the "Replacement Lien") in all of the Debtor's presently owned or thereafter acquired property and assets to the extent that such property and assets would have constituted prepetition collateral.  In addition, as security for the Adequate Protection Claim, the Court required the Debtor to provide monthly adequate protection payments to GECC of $5,000 (the "Adequate Protection Payments"), which payments reduced the principal amount of the secured portion of the GECC Loan.

GECC objected to the entry of a Final Order and simultaneously therewith, filed a motion seeking the appoint of a chapter 11 trustee to administer the Debtor's Estate (the "Trustee Motion").  A contested evidentiary hearing was held before the Court on January 27, 2011 to consider entry of a Final Order and the Trustee Motion.  By Order dated February 14, 2011 (the "Second Interim Order"), the Court granted the Debtor continued use of Cash Collateral, on an interim basis, pending a hearing to be held before the Court on March 3, 2011 to consider entry of a Final Order.  Pursuant to the Second Interim Order, the Court modified the Replacement Lien to include the intercompany amounts due from Strip House Key West LLC to the Debtor in the amount of $744,000 (the "Modified Replacement Lien").  In addition, the Court conditioned the use of Cash Collateral on the appointment of John Dunne as Chief Restructuring Officer of the Enterprise, thus rendering the Trustee Motion moot.  Further, the Court provided for the Debtor's cooperation with GECC and the Creditors' Committee in disclosing information necessary for FTI Consulting to engage in discussions with potential acquirers of all or part of the Enterprise.

A second contested evidentiary hearing was held before the Court on March 3, 2011 to consider entry of a Final Order.  By Order dated March 7, 2011 (the "Third Interim Order"), the

Court granted the Debtor continued use of Cash Collateral, on an interim basis, pending a hearing before the Court on May 4, 2011 to consider entry of a Final Order. Pursuant to the Third Interim Order, the Court increased the monthly Adequate Protection Payments due to GECC to $29,653, which amount is equal to the monthly interest due on the principal balance of the GECC Loan.

On the consent of the Debtor and GECC to further extend the Debtor's use of Cash Collateral while the Debtor progressed towards closing the Asset Sale, the Court entered an Order, dated May 4, 2011, granting the Debtor continued use of Cash Collateral, on an interim basis, pending a hearing before the Court on June 28, 2011 to consider entry of a Final Order.

*The Exclusivity Motion.* Pursuant to Section 1121(b) of the Bankruptcy Code, the Debtor's exclusive periods to file a chapter 11 plan of reorganization and solicit acceptances thereof (the "Exclusive Periods") were set to expire on March 16, 2011 and May 15, 2011, respectively. The Debtor sought a 90-day extension of its Exclusive Periods due, in part, to the extensive and time consuming litigation with GECC over the use of Cash Collateral, as set forth above, which impeded the Debtor's ability to formulate a plan of reorganization within the Exclusive Periods. GECC, in its objection to the Exclusivity Motion, indicated that if the Exclusive Periods were extended, GECC would seek to conduct UCC sales of the Restaurant Affiliates' assets and member ownership interests in satisfaction of the GECC Loan. By Order dated April 6, 2011, the Court granted the Debtor's application for the extension of the Exclusive Periods to April 30, 2011 with authority to solicit votes in support of a filed plan to June 15, 2011. At the same time, the Court authorized GECC and the Creditors' Committee to file and solicit in concert their own joint plan of reorganization.

Thereafter, the Selling Affiliates, in consultation with the Debtor, entered into the Sale

Agreement for the sale of all the assets of the Selling Affiliates in order to avoid the GECC

threatened foreclosure sale.

**B.      The Official Committee of Unsecured Creditors**

On January 14, 2011, the U.S. Trustee appointed the Creditors' Committee in this

Chapter 11 Case.    The Creditors' Committee currently consists of three members.    The

Creditors' Committee has retained SilvermanAcampora, LLP as its counsel.  The members of the

Creditors' Committee are as follows:

> Premium Supply Co., Inc.
> 960 Grand Blvd.
> Deer Park, New York 11729
> Attn: Jay C. Pattinger, President
> Tel: (302) 636-6391
>
> Niche Media Holdings, Inc.
> 100 Church Street
> New York, New York 10007
> Attn: Jeffrey Maidenbaum, Esq.
> Tel: (516) 223-8552
>
>
> Newmarket International, Inc.
> 75 New Hampshire Avenue
> Portsmouth, New Hampshire 03801
> Attn: John Fellows
> Tel: (603) 427-5794

On May 19, 2011, the Debtor filed an objection to the claim of Premium Supply Co., Inc.

("Premium"), the chair of the Creditors' Committee, on the basis that while Premium may have

claims against certain of the Restaurant Affiliates, it disclaimed any claim against the Debtor

pursuant to a pre-petition settlement agreement between Premium on one hand, and the Debtor

and certain Restaurant Affiliates on the other.  A hearing to consider that objection was held on

June 30, 2011.  By order entered August 10, 2011 (Docket No. 151), Premium's claim was

expunged in its entirety.  Although there has been no formal notification received, the Debtor

assumes that Premium has resigned from the Creditors' Committee.

On August 10, 2011, the Debtor filed an objection to the claim of Niche Media Holdings

LLC ("Niche"), on the basis that while Niche may have claims against certain of the Restaurant

Affiliates, Niche never supplied goods or services to the Debtor, nor is the Debtor a party to the

advertising contract between Niche and the Debtor's Las Vegas affiliate.  A hearing to consider

that objection will be held on September 20, 2011.

### C.    Disclosure Statement/Plan Confirmation Hearings

Simultaneously with the filing of its Plan, the Debtor filed a motion to consider the

adequacy of this Disclosure Statement.  On September 8, 2011, the Court entered the Disclosure

Statement Order.  As provided by the Disclosure Statement Order and as noted earlier in this

Disclosure Statement, the hearing on confirmation of the Plan is scheduled for October 13, 2011.

### VI.
### SUMMARY OF THE PLAN OF REORGANIZATION

### A.    Introduction

The Debtor believes that confirmation of the Plan provides the best opportunity for

maximizing recoveries for its creditors.  The Debtor believes, and will demonstrate to the Court,

that its creditors will receive not less than the amount that they would receive in a liquidation

under chapter 7 of the Bankruptcy Code.  The following is a summary of the Plan.  The Plan is

attached as Exhibit A to this Disclosure Statement.  The terms of the Plan govern in the event of

any discrepancies with the following discussion.

### B.    Classification and Treatment of Administrative Expense Claims, Claims and Equity Interests Under the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that a debtor agrees, or in the event of a dispute, that the court determines, that the administrative expense, claim or equity interest, including the amount, is in fact a valid obligation of, or interest in, a debtor. Section 502(a) of the Bankruptcy Code provides that a timely-filed administrative expense, claim or equity interest is automatically "allowed" unless a debtor or another party in interest objects.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in a debtor, into separate classes based upon the legal rights and obligations attached to the claim or interest. Substantially similar claims are usually, but not necessarily, classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves members of multiple classes of claims and/or equity interests. To the extent of this holder's Claim, the holder would be entitled to the voting and treatment rights that the Plan provides with respect to each class of claim in which they are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy

Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable and contractual rights of the holders of such claims or interests or; (ii) irrespective of the holder's right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements, the Plan divides the Claims against, and Equity Interests in, the Debtor into the following Classes:

| Unclassified | Administrative Expense Claims | Paid in full |
|---|---|---|
| Unclassified | Priority Tax Claims | Paid in full |
| Unclassified | Priority Non-Tax Claims | Paid in full |
| Class 1 | GECC Claim | Unimpaired |
| Class 2 | Joint Legacy Claims | Impaired |

| Class 3 | Unsecured Claims | Impaired |
| Class 4 | Affiliate Claims | Impaired |
| Class 5 | Equity Interests | Impaired |

For purposes of computing Distributions under the Plan, Allowed Claims do not include post-petition interest unless otherwise specified in the Plan.

## 1.    Unclassified—Administrative Expense Claims

Administrative Expense Claims are Claims constituting costs or expenses of administration of the Chapter 11 Case.  Such Claims include any actual and necessary costs and expenses of preserving the Debtor's estate, any indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business, all compensation and reimbursement of expenses to the extent Allowed by the Court under the Bankruptcy Code and any fees or charges assessed against the Debtor's estate owed to the office of the U.S. Trustee.

Pursuant to the Plan, unless less favorable treatment is otherwise agreed to by the holder of an Administrative Expense Claim and the Debtor or Glazier Holdings, LLC, each holder of an Allowed Administrative Expense Claim will receive, in full satisfaction, settlement, release and discharge of its Administrative Expense Claim, Cash equal to the amount of such Allowed Administrative Expense Claim either (i) on the Effective Date or as soon thereafter as reasonably practicable or (ii) if the Administrative Expense Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order.

Administrative Expense Claims based on liabilities incurred by the Debtor in the ordinary course of business will be paid by the Debtor pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed Administrative Expense Claims;

provided, however, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law, secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

### 2.    Unclassified—Professional Fee Claims

Professional Fee Claims are Administrative Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to Sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code.    All payments to Professional Persons for Professional Fee Claims will be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses.    The Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

Pursuant to the Plan, all final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served the Debtor and the Creditors' Committee no later than thirty (30) days after the Effective Date.    After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

Subject to any holdback amount, on the Effective Date, the Debtor shall pay to Herrick, Feinstein LLP, to be held in reserve, all amounts owing to Professional Persons for all outstanding amounts (including estimated amounts owing to Professional Persons) payable

relating to prior periods through the Effective Date.  The Professional Persons shall reasonably estimate fees and expenses due for periods that will not have been billed as of the Effective Date and shall deliver such estimate to the Debtor and the United States Trustee prior to the Effective Date.   The Debtor or Glazier Holdings, LLC, as applicable, shall cause to be paid the Professional Person's reasonably estimated amount of such fees and expenses as soon as reasonably practicable after receiving the estimate, but in no event prior to the date on which such Professional Persons compensation shall have been awarded by the Bankruptcy Court.

### 3.    Unclassified—Priority Tax Claims

A Priority Claim consists of any Claim of the kind specified in section 507 of the Bankruptcy Code.  These Unsecured Claims are given a statutory priority in right of payment. Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtor (i) on the Effective Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) receive such treatment provided for in section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other less favorable treatment as to which the Debtor and such holder shall have agreed upon in writing.

### 4.    Unclassified—Priority Non-Tax Claims

A Priority Claim consists of any Claim of the kind specified in section 507 of the Bankruptcy Code.  These Unsecured Claims are given a statutory priority in right of payment. On, or as soon as reasonably practicable after the later of (a) the Effective Date, (b) the date of any Distribution immediately following the date on which an Allowed Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtor and the holder of such Priority Non-Tax Claim or (c) the date on which an Allowed Priority Non-Tax Claim becomes payable

28

pursuant to and as specified by a court order, the holder of such Allowed Priority Non-Tax Claim

shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such

Allowed Priority Non-Tax Claim, either (i) Cash equal to the unpaid portion of the face amount

of such Allowed Priority Non-Tax Claim or (ii) such other less favorable treatment as to which

the Debtor and such holder shall have agreed upon in writing.

### 5.    Class 1—GECC Claim (Unimpaired; therefore, deemed to have accepted the Plan and not entitled to vote)

In full satisfaction, settlement, release and discharge of the GECC Allowed Claim, GECC

shall be paid 100% of its Allowed Claim in Cash.  from the proceeds of the Asset Sale on the

Confirmation Date.  In the event the allocated Cash proceeds of the Asset Sale are insufficient to

then pay the Allowed GECC Claim in full, the remaining GECC Claim balance shall be paid in

full in Cash on the Plan Effective Date.

### 6.    Class 2—Joint Legacy Claims (Impaired; therefore, entitled to vote to accept or reject the Plan)

Class 2 consists of the Claims of D'Arrigo Food Service, Inc. ("D'Arrigo") and Foodland

Distributors, Inc. ("Foodland"), which Claims are subject to and given certain priority under the

Perishable Agricultural Commodities Act ("PACA").  Both D'Arrigo and Foodland filed proofs

of claim in this Chapter 11 Case asserting secured claims entitled to priority under PACA in the

amounts of $278,265 and $47,467, respectively.  D'Arrigo and Foodland entered into a

stipulation with the Debtor dated June 1, 2011, and approved by the Bankruptcy Court on July

25, 2011, whereby D'Arrigo and Foodland agreed to be paid $179,000 and $30,000,

respectively, under the Plan.  In full satisfaction, settlement, release and discharge of each

holder's Allowed Joint Legacy Class 2 Claim, the respective stipulations and agreements fixing

and settling such Claims shall be assumed by the Debtor on the Confirmation Date and all

payment defaults shall be cured thereon, and thereafter each holder of an Allowed Joint Legacy

Claim shall be paid in full settlement, release, and discharge thereof in accordance with the terms set forth in the respective stipulations or agreements fixing and settling such Claim.

### 7.    Class 3—Unsecured Claims (Impaired; therefore, entitled to vote to accept or reject the Plan)

In full satisfaction, settlement, release and discharge of the Debtor's obligations to each holder of an Allowed Class 3 Unsecured Claim, each holder of an Allowed Unsecured Claim shall receive 20% of such holders' Allowed Claim, payable in two equal installments, with the initial payment to be made as soon as practicable on or after the Effective Date, and the final payment to be made within 30 days of the end of calendar year 2011.

### 8.    Class 4—Affiliate Claims (Impaired; due to status as Affiliates of the Debtor, vote of holders of Allowed Class 4 Affiliate Claims will not be solicited)

Affiliate Claims which are not satisfied in connection with the Asset Sale shall be reinstated and each holder of an Allowed Class 4 Affiliate Claim shall agree to forebear exercising any rights and agree not to receive any payment on their claims for a period of three years from the Effective Date.  As of the Petition Date, the aggregate amount of Affiliate Claims against the Debtor is $11,044,886.09.[2]

### 9.    Class 5—Equity Interests in the Debtor (Impaired; deemed to have rejected the Plan)

On the Effective Date, Equity Interests in the Debtor shall be cancelled and holders of Equity Interests will receive no Distributions on account of their Equity Interests in the Debtor under the Plan.

---

[2] The Debtor also has claims against certain other affiliates, some of which are presently active and some of which are no defunct.  As of August 31, 2011, those claims aggregate approximately $1,821,866.  As set forth in the accompanying liquidation analysis, the Debtor believes that, with the exception of a claim against Strip House Las Vegas, LLC in the amount of $714,397, the remaining claims against affiliates are uncollectible.

C.    **Provisions Regarding Corporate Governance and Management of the Reorganized Debtor and the Issuance of Membership Interests in Glazier Holdings, LLC**

1.    **Directors and Officers of Glazier Holdings, LLC**

(a)    **Board of Directors.**  The Reorganized Debtor shall have a three (3) member board of directors, which members shall be appointed by the holders of its membership interests.  The Debtor's current board of directors shall continue to serve until the Effective Date, at which time each member of the current board shall be deemed to have resigned from the board.

(b)    **Officers of Glazier Holdings, LLC**.   On the Effective Date, the executive officers of the Reorganized Debtor will be Peter H. Glazier, Mathew Glazier and Penny Glazier, each of whom shall serve pursuant to written agreements as otherwise executed and approved by the Reorganized Debtor, and their respective titles shall be:

Peter H. Glazier:        Chief Executive Officer

Mathew Glazier:        President/General Counsel

Penny Glazier:          Secretary

2.    **Cancellation of Existing Equity Interests**

As of the Effective Date, all existing Equity Interests in the Debtor, without any further action, shall be cancelled, annulled and extinguished and all certificates or other instruments representing such Equity Interests shall be void.

3.    **Plan Funding and Transfer of Membership/Stock Interests in Restaurant Affiliates to Glazier Holdings, LLC**

On the Effective Date, the Equity Holders, as owners of 100% of the membership stock/interests in the Restaurant Affiliates, shall cause the Restaurant Affiliates to transfer Cash in the amount of $1 million (or such other amount as is necessary to make all Distributions

contemplated under the Plan) to the Debtor[3], and they shall at the same time transfer their entire restaurant membership interests to the Reorganized Debtor, and each of the Restaurant Affiliates shall thereupon become wholly-owned subsidiaries of the Reorganized Debtor.  In consideration thereof for the said transfer, the Equity Holders shall receive 100% of the Equity Interests in the Reorganized Debtor on the Effective Date.

Section 1123(a)(5)(C) of the Bankruptcy Code specifically authorizes a debtor to merge with non-debtor entities as a means of implementing a chapter 11 plan.  <u>See</u> <u>11 U.S.C. §1123(a)(5)(C)</u> (plan may provide for the "merger or consolidation of the debtor with one or more persons");  <u>see</u> <u>also</u> <u>In re Owens Corning</u>, 419 F.3d 195, 209, n. 14 (3d Cir. 2005) citing <u>Sampsell v. Imperial Paper & Color Corp.</u>, 313 U.S. 215 (1941) ("[c]onsolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's <u>Sampsell</u> decision in 1941").  The proposed merger of the Debtor and the Restaurant Affiliates into Glazier Holdings, LLC will streamline the structure of the relationship between the Debtor and the Restaurant Affiliates, while allowing existing business operations to continue and preserving the values of the Restaurant Affiliates.  Accordingly, the proposed merger is appropriate and necessary to implement the Plan.  <u>See</u> <u>In re Fremont General Corp.</u>, 2010 WL 4739439 at *16, No. 8:08-bk-13421 (Bankr. C.D. Cal. June 9, 2010) (holding merger appropriate and necessary where streamlined structure of the debtor's corporate enterprise would consolidate assets with the debtor, while maintaining existing business operations and preserving asset values).

---

[3] Pennyport L.L.C. shall not contribute any funds to make Distributions under the Plan.

### 4.      Corporate Action

On the Effective Date, and without limitation of any other provision of the Plan, the adoption and filing of certificate of formation of Glazier Holdings, LLC, and all other actions and documents contemplated to be taken or executed on the Effective Date, shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for in the Plan involving the corporate structure of the Debtor or Glazier Holdings, LLC, and any corporate action required by the Debtor or Glazier Holdings, LLC in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by officers, directors and employees of the Debtor or Glazier Holdings, LLC.  On the Effective Date, the appropriate officers of Glazier Holdings, LLC are authorized and directed to issue, execute and deliver the agreements, documents, membership interests and instruments contemplated by the Plan in the name of and on behalf of Glazier Holdings, LLC without the need for any required approvals, authorizations, or consents, except and solely to the extent provided for in the Plan.

### D.      Means of Distributions Under the Plan and Implementation

#### 1.      Distribution Provisions

(a)      **Date of Distributions**.  Unless otherwise provided herein, the Distributions to be made hereunder shall be made on the Effective Date or as soon as practicable thereafter and deemed made on the Effective Date.  In the event that any Distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such Distribution or the performance of such act maybe completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(b)      **Delivery of Distributions**.  All Distributions to any holder of an Allowed Claim shall be to the address of such holder as set forth on the Schedules, or the books of the Debtor, unless the Debtor has been notified in writing of a change of address, including,

without limitation, by filing of a proof of Claim by such holder that contains an address for such

holder different from the address reflected in the Schedules or records of the Debtor.  In the

event that any Distribution to any holder is returned as undeliverable, the appropriate Disbursing

Agent shall use reasonable efforts to determine the current address of such holder, but no

Distribution to such holder shall be made unless and until the Disbursing Agent has determined

the then current address of such holder, at which time such Distribution shall be made to such

holder without interest; provided that such Distributions shall be deemed unclaimed property

under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective

Date or the Distribution Date, whichever shall apply.  After such dates, all unclaimed property or

interests in property shall revert to Glazier Holdings, LLC, and the Claim of any other holder of

such property or interest in property shall be discharged and forever barred.

    (c)    **Setoffs and Recoupment**.  The Debtor (and/or the Restaurant

Affiliates with respect to any Joint Legacy Claim) may, but shall not be required to, set off

against, or recoup from, any Claim and the payments to be made pursuant to the Plan in respect

of such Claim, any Claims of any nature whatsoever that the Debtor (and/or the Restaurant

Affiliates with respect to any Joint Legacy Claim) may have against the Claimant, but neither the

failure to do so nor allowance of any Claim hereunder shall constitute a waiver or release by the

Debtor (and/or the Restaurant Affiliates) of any such Claim it may have against the Claimant.

    (d)    **Distributions After Effective Date**.  Distributions made after the

Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective

Date but which later become Allowed shall be deemed to have been made on the Effective Date.

    (e)    **Distribution to Holders as of the Confirmation Date.**  As of the

close of business on the Confirmation Date, the claims register shall be closed, and there shall be

no further changes in the record holder of any Claims.  The Debtor, Glazier Holdings, LLC and the Disbursing Agent shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Confirmation Date.

**2.    Cancellation and Surrender of Existing Securities and Agreements**

Except as otherwise expressly provided for herein, or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all Equity Interests and any other promissory notes, share certificates, whether for a preferred or common stock (including any treasury stock), other instruments evidencing Claims or Equity Interests, other than a Claim that is being reinstated and rendered unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such interests shall be deemed cancelled and of no further force and effect, without any further act or action under applicable agreement, law, regulation, order or rule, and the obligations of the Debtor under the notes, share certificates and other agreements and instruments governing such Claims and Equity Interests shall be discharged.  On the Effective Date, the holders of or parties to such cancelled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

**3.    Compensation and Benefit Programs**

Except as otherwise provided by the Plan, all employment plans, policies, practices, programs and policies maintained by The Glazier Group, Inc. as of the Effective Date shall

remain in full force and effect following the Effective Date, subject to any and all rights of the

Debtor and/or Glazier Holdings, LLC under applicable non-bankruptcy law to amend or

terminate such plans, policies, practices and programs.

### E.    Rights and Obligations of the Disbursing Agent

#### 1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to (i) take all steps and execute all instruments

and documents necessary to effectuate the disbursements to be made under the Plan; (ii) make

Distributions contemplated by the Plan; (iii) comply with the Plan and the obligations

thereunder; (iv) employ, retain, or replace professionals to represent it with respect to its

responsibilities; and (v) exercise such other powers as may be vested in it pursuant to order of

the Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry

out the provisions of the Plan.

#### 2.    Duties of the Disbursing Agent

The Disbursing Agent shall have the duties of carrying out the disbursements under the

Plan, which shall include taking or not taking any action which the Disbursing Agent deems to

be in furtherance thereof, including, from the date of its appointment, making payments and

conveyances and effecting other transfers necessary in furtherance of the Plan.

**F.**      **Procedures for Treating Disputed Claims Under the Plan**

**1.**      **Disputed Claims**

Except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, the Debtor and/or Glazier Holdings, LLC shall have the exclusive right to make and file objections to Claims subsequent to the Effective Date.  All objections shall be litigated to Final Order, provided, however, that Glazier Holdings, LLC shall have the authority to compromise, settle, otherwise resolve or withdraw any objections without approval of the Bankruptcy Court.

**2.**      **No Distributions Pending Allowance**

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, payment or Distribution provided hereunder shall be made only with respect to the undisputed portion on account of such Claim unless prior to the date of such Distribution, the holder of such Claim obtains an order of the Bankruptcy Court, on notice to the Debtor, prohibiting the Debtor to defer such Distribution unless and until such Disputed Claim is Allowed pursuant to a Final Order.

**3.**      **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, a Distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order or the objection(s) to a Disputed Claim are resolved, the appropriate Disbursing Agent shall provide to the holder of such Claim the Distributions to which such holder is entitled under the Plan.

### 4.    Voting of Claims

Pursuant to Bankruptcy Rule 3018(a), a Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is Disputed, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).    Such disallowance for voting purposes shall be without prejudice to the holders of such Disputed Claim seeking to have such Disputed Claim become an Allowed Claim for purposes of Distribution under the Plan.

### G.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumed If Not Rejected

The Plan constitutes and incorporates a motion by the Debtor to assume, and the Confirmation Order shall, subject to payment of Cure Amounts as set forth in the Cure Notice (defined in Section 9.2 of the Plan), be deemed to be an order authorizing the assumption of, all executory contracts and unexpired leases to which the Debtor is a party except for those executory contracts and unexpired leases (a) listed on a supplement to be filed prior to the deadline for voting whether to accept or reject the Plan (which supplement may be modified on or before the Confirmation Date to add or remove contracts and leases) or (b) which have on or before the Confirmation Date been (i) rejected by Bankruptcy Court order or by operation of law, (ii) expressly assumed or rejected pursuant to an order of the Bankruptcy Court prior to the Confirmation Date, or (iii) included in a motion to assume or reject made by the Debtor which is pending before the Bankruptcy Court on the Confirmation Date.    Nothing herein will be deemed to extend any deadline previously set by the Court for filing proofs of Claims, including with regard to contracts and leases heretofore rejected by Court order.    If for any reason a prior order of the Court setting a deadline for the filing of proofs of Claims is found to be not applicable to the damages resulting from the rejection of an executory contract or unexpired lease, such Claim

for damages shall nevertheless be forever barred and shall not be enforceable against the Debtor, its estate or Glazier Holdings, LLC unless a proof of Claim is filed with the Bankruptcy Court not later than thirty (30) days after service of notice of entry of the Confirmation Order and notice of the requirement to file a proof of Claim.

### 2.    Objection to Assumption

In connection with the proposed assumption of the Debtor's executory contracts and unexpired leases, the Debtor will file with the Court and serve upon all counterparties a notice substantially in the form annexed hereto as Exhibit B (the "Cure Notice") which will set forth the amounts for unpaid monetary obligations under such contract or lease (the "Cure Amount") and the procedures to be adhered to if an entity objects to the Cure Amount.

Any entity which is a party to an executory contract or unexpired lease to be assumed hereunder shall, in accordance with the Cure Notice, file with the Bankruptcy Court and serve upon Debtor's Counsel any objection to assumption and the Cure Amount setting forth the basis for the objection, the nature of any alleged defaults thereunder and all monetary and non-monetary cures allegedly due. Failure to file an objection in accordance with the procedures set forth in the Cure Notice shall be deemed a consent to the proposed assumption and to the Cure Amount due, as reflected in the Debtor's books and records.

### H.    Conditions Precedent

### 1.    Conditions Precedent to Effective Date

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(i)    the Selling Affiliate Asset Sale shall have been consummated;

(ii)    the Confirmation Order shall have become a Final Order; and

(iii)  all actions necessary to implement the terms and provisions of the Plan including, but not limited to, execution and delivery of all agreements, instruments or other documents attendant to the Asset Sale, shall have been completed, and such agreements shall have become effective in accordance with their terms.

### 2.    Waiver of Conditions Precedent to Effective Date

The conditions set forth in Section 10.1 of the Plan may be waived by the Debtor.

### 3.    Effect of Failure of Conditions

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (ii) prejudice in any manner the rights of the Debtor or any creditors; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any creditors in any respect.

### I.    Effect of Confirmation of the Plan

### 1.    Continued Corporate Existence

The Debtor shall continue to exist after the Effective Date as Glazier Holdings, LLC with all powers of a limited liability company under the laws of the State of New York and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under New York law; and, following the Effective Date, Glazier Holdings, LLC may operate its business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan and the Confirmation Order.

### 2.    Vesting of Assets

Except as otherwise expressly provided in the Plan and the Confirmation Order, on the Effective Date, Glazier Holdings, LLC shall be vested with all of the property of the Estate free

and clear of all Claims, liens, encumbrances, charges and other interests including but not limited to that of Claimants and holders of Equity Interests.

### 3.    Discharge of the Debtor

Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties, and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor shall (i) be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based upon such debt accepted the Plan, and (ii) terminate all Equity Interests.

As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor or the Reorganized Debtor or any of their assets or properties, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature with respect to the Debtor that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor and termination of all Equity

Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Equity Interest.  None of the foregoing shall preclude an applicable governmental taxing authority from conducting a tax audit, covering the postpetition, pre-Effective Date period or from asserting and recovering a Claim arising from such tax audit, to the extent such Claim is an Allowed Claim.  Notwithstanding anything to the contrary contained in the Plan, any claims held by creditors of the Debtor, or by third parties, against one or more of the Restaurant Affiliates are not affected by the Plan or confirmation of the Plan.

### 4.    Injunction

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, or their property on account of any such discharged Claims, debts, or liabilities or terminated Equity Interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a right of subrogation of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

As of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, debt, right, cause of action, or liability that is discharged, or an Equity Interest that is terminated, pursuant to Section 11.3 or 11.7 of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities, or such terminated Equity Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Without limiting the effect of the foregoing provisions of this Section 11.4 upon any Person, by accepting a Distribution pursuant to the Plan, each holder of an Allowed Claim receiving a Distribution pursuant to the Plan shall be deemed to have specifically consented to the injunctions in favor of the Debtor and Reorganized Debtor set forth in Section 11.4 of the Plan.

Nothing in Section 11.4 of the Plan shall impair (i) the rights of any holder of a Disputed Claim to establish its Claim in response to an objection filed by the Debtor or the Reorganized Debtor, (ii) the rights of any defendant in an Avoidance Action filed by the Debtor to assert defenses in such action, or (iii) the rights of any party to an executory contract or unexpired lease that has been assumed by the Debtor pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

**5.      Extinguishment of Causes of Action Under the Avoiding Power Provisions**

On the Effective Date, all rights, claims, causes of action, avoiding powers, suits and proceedings arising under sections 506(c), 544, 545, 547, 548, 549 and 553 of the Bankruptcy Code shall be extinguished unless then pending.  Except to the extent released in the Plan (including under Section 11.7) or order of the Bankruptcy Court, the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all other Claims, causes of action, rights of setoff and other legal or equitable defenses which the Debtor had immediately prior to the Petition Date as fully as if the Chapter 11 Case had not been commenced; and any of the Reorganized Debtor's legal and equitable rights respecting any such Claims which is not specifically waived, extinguished or relinquished by this Plan or order of the Bankruptcy Court may be asserted after the Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

### 6.     Votes Solicited In Good Faith

The Debtor has, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtor and the Released Parties participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the issuance of the securities offered under the Plan and therefore have not, and on account of such issuance and solicitation will not, be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan.

### 7.     Releases and Related Matters

*Releases by the Debtor.*  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor and any Person or Entity seeking to exercise the rights of the Debtor's Estate, including without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to section

44

1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and liabilities whatsoever in connection with or related to the conduct of the Debtor's business, the Chapter 11 Case, or the Plan (other than the rights of the Debtor and the Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtor, the Estate, or the Reorganized Debtor against (i) any of the present or former members, shareholders, directors, officers, employees or advisors of the Debtor, (ii) any Professionals of the Debtor, (iii) the Creditors' Committee, its members, and its professionals and their advisors, respectively (but not its members in their individual capacities), and (iv) the Disbursing Agent.

*Releases by Holders of Claims.*    As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that receives a Distribution pursuant to the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the present or former shareholders, directors, officers and employees of the Debtor (collectively, the "Releasees"), in connection with or related to such Claim, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or

unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

Notwithstanding anything to the contrary, neither the Plan nor the entry of the Confirmation Order nor the occurrence of the Effective Date shall have any effect upon the License Agreement dated as of November 12, 1997, and amended as of October 26, 2004 and as of November 15, 2010 and that certain Non-Negotiable Promissory Note, dated as of November 15, 2010 (the "License Documents") (including the validity and enforceability of any of the terms and conditions contained therein and any rights and remedies Jump Higher, L.L.C. may have under the License Documents and applicable law) and no provision in this Plan or Confirmation Order, including the injunctions, releases, and exculpations shall in any way affect, release, waive, enjoin, or limit any rights, remedies, causes of action or claims that Jump Higher, L.L.C. may have as against Pennyport, L.L.C. under the License Documents or applicable law.

### 8.    Exculpation and Limitation of Liability

Neither the Debtor, the Reorganized Debtor, the Creditors' Committee (as to itself or any of its members), nor any of their respective present or former members, officers, managers, directors, employees, advisors, Professionals, or agents, shall have or incur any liability to any holder of a Claim or an Equity Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission up until the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation or acceptance of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud,

gross negligence, or willful misconduct; provided, however, that the foregoing shall not extinguish the personal liability of the aforementioned Entities for any statutory violation of applicable tax laws; provided further, however, that the foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law.

Notwithstanding any other provisions of the Plan, no Holder of a Claim or an Equity Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against the Debtor, the Reorganized Debtor, the Creditors' Committee, or of their respective present or former members, officers, managers, directors, employees, advisors, Professionals, or agents, for any act or omission up until the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct; provided, however, that the foregoing shall not bar any right of action asserted by a governmental taxing authority against the aforementioned Entities for any statutory violation of applicable tax laws.

### 9.      Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 10.      Preservation of Insurance

The Debtor's discharge and release from all Claims as provided herein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any

insurance policy that may cover Claims against the Debtor, Glazier Holdings, LLC (including, without limitation, its officers and directors) or any other Person or Entity.

### 11.    Officers' and Directors' Indemnification Rights and Insurance

Indemnification Obligations owed to directors, officers and employees of the Debtor (or the estate of the foregoing) who served or were employed by the Debtor as of or after the Petition Date for claims arising after the Petition Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code and Section 9.1 of the Plan.  Indemnification Obligations owed to any such directors, officers and employees of the Debtor (or the estate of the foregoing) for claims arising before the Petition Date or for claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan.

All Indemnification Obligations owed to directors, officers and employees of the Debtor who served or were employed by the Debtor prior to, but not after, the Petition Date (i.e., those directors, officers and employees who did not serve in such capacity after the Petition Date) shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan.

Upon and after the Effective Date, the Debtor or Glazier Holdings, LLC, as the case may be, shall continue to maintain director and officer insurance coverage for those Persons covered by any such policies in effect during the pendency of the Chapter 11 Case.

J.      **Retention of Jurisdiction**

1.      **Scope of Jurisdiction**

Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy

Court shall retain and have jurisdiction of all matters arising in, arising under, and related to the

Chapter 11 Case and the Plan pursuant to, and for the purpose of sections 105(a) and 1142 of the

Bankruptcy Code and for, among other things, the following purposes:

(i)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date and the allowance of Claims resulting therefrom;

(ii)    To hear and determine any and all adversary proceedings, applications, and contested matters, including any remands of appeals, pending on the Effective Date;

(iii)   To ensure that Distributions to holders of Allowed Claims are accomplished as provided by the Plan;

(iv)    To resolve disputes as to the ownership of any Claim;

(v)     To hear and determine any timely objections to or applications concerning Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense Claim, or Claim, or Equity Interest;

(vi)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(vii)   To enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder;

(viii)  To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(ix)    To hear and determine applications for compensation and reimbursement of expenses of Professional Persons under sections 330, 331 and 503(b) of the Bankruptcy Code;

(x)     To hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(xi)    To hear and determine any issue for which the Plan requires a Final Order of the Court;

(xii)   To enter and implement orders and to take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer, and enforce injunctions, releases, assignments, or indemnity obligations contained in the Plan and the Confirmation Order;

(xiii)  To hear and determine motions seeking a compromise, settlement, release, or abandonment of any Contested Claim or Designated Claim or any claim or cause of action arising on or before the Effective Date by or against the Debtor;

(xiv)   To recover all assets of the Debtor and property of the Estate, wherever located;

(xv)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xvi)   To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(xvii)  To enter a final decree closing the Chapter 11 Case.

**K.    Miscellaneous Provisions**

**1.    Creditors' Committee**

The Creditors' Committee shall be extinguished on the Effective Date, and after the Effective Date the Creditors' Committee shall have no authority or obligation to act as a committee or as a representative of holders of Class 3 Claims or to take any other actions on behalf of said Class.

## 2. Compliance With Tax Requirements

In connection with the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all Distributions hereunder shall be subject to such withholding and reporting requirements. No Distributions shall be made to the holder of any Claim which fails to provide the Disbursing Agent with any and all information it requests in connection with such withholding and reporting requirements. If all such information is not provided to the Disbursing Agent within 90 days of its written request for same, the holder of such Claim shall forfeit its rights to any distribution on account of such Claim and such Distribution shall be retained by and for the benefit of the Reorganized Debtor.

## 3. Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the Reorganized Debtor.

## 4. Pre-Confirmation Modification

The Plan may be altered, amended or modified prior to the entry of the Confirmation Order as provided in section 1127 of the Bankruptcy Code.

## 5. Post-Confirmation Immaterial Modifications

The Debtor may, prior to the Effective Date, and without the approval of the Bankruptcy Court, and without notice to all holders of Claims and Interests, insofar as it does not materially adversely affect the interest of holders of Claims and Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite the execution of the Plan.

### 6.    Revocation or Withdrawal of Plan

The Debtor may revoke or withdraw the Plan at any time prior to the Effective Date.  If the Plan is so revoked or withdrawn, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

### 7.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof) will govern the construction and implementation of the Plan and any agreements, documents and instruments in connection with the Plan.

### 8.    Notices

All notices, requests or demands for payments shall be in writing and shall be deemed to have been given when personally delivered by hand or deposited in any depository under the control of the United States Postal Service or when received by courier or facsimile transmission. Notices shall be sent or delivered to:

> The Glazier Group, Inc
> 535 Fifth Avenue
> New York, NY 10017
> Tel. No. (212) 406-7900
> Attn:   John Dunne
>              Peter H. Glazier
>
> with a copy to:
>
> Herrick, Feinstein LLP
> 2 Park Avenue
> New York, NY 10016
> Tel. No. (212) 592-1400
> Fax No. (212) 592-1500
> Attn:    Joshua J. Angel

Frederick E. Schmidt, Jr.
Justin B. Singer

Silverman Acampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Tel. No. (516) 479-6300
Attn:   Adam Rosen

### 9.      Post-Confirmation Date Service List

From and after the Confirmation Date, all notices of appearance and demands for service

of process filed with the Court prior to such date shall no longer be effective.  No further notices,

other than notice of entry of the Confirmation Order shall be required to be sent to such Entities.

### 10.      Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of

notes or equity securities under or in connection with the Plan, the creation of any mortgage,

deed of trust or other security interest, the making or assignment of any lease or sublease or the

making or delivery of any deed or other instrument or transfer under, in furtherance of, or in

connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage

recording or other similar tax.

### 11.      Filing or Execution of Additional Documents

On or before the Effective Date, the Debtor or the Reorganized Debtor will file with the

Court or execute, as appropriate, such agreements and other documents as may be necessary or

appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12.      Section 1145 Exemption

Pursuant to, in accordance with, and to the extent provided under section 1145 of the

Bankruptcy Code, and to the extent that the Debtor is not an underwriter, as defined under

section 1145(b) of the Bankruptcy Code, the issuance of the membership interests in Glazier

Holdings, LLC and all other securities that may be deemed to be issued under the Plan shall be exempt from the registration requirements of Section 5 of the Securities Act, as amended.

## VII.
## CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Solicitation of Votes

In accordance with Sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 2 and 3 and of the Plan are impaired and the holders of Allowed Claims in Classes 2 and 3 are entitled to vote to accept or reject the Plan.  Claims in Classes 1 and 4 are unimpaired.  The holders of Allowed Claims in such Classes are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Classes therefore is not required under section 1126(f) of the Bankruptcy Code.  Holders of Interests in Class 5 will not receive any distributions and are deemed to have rejected the Plan.  Chapter 11 of the Bankruptcy Code provides that, in order for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of Impaired Claims against, and Impaired Interests in, the Debtor that are entitled to vote must accept the Plan.

An Impaired Class of Claims will have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code or any insider.

A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Code.

Any creditor in an impaired Class (i) whose Claim has been listed by the Debtor in the Debtor's Schedules filed with the Court (provided that such Claim has not been scheduled as Disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before May 3, 2011 (for non-governmental units), or May 16, 2011 (for governmental units) (or, if not filed by such date, any proof of Claim filed within any other applicable period of limitations or with leave of the Court), which Claim is not the subject of an objection or request for estimation, is entitled to vote.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for October 13, 2011 at 11:00 a.m. Eastern Standard Time, before the Honorable Allan L. Gropper, at the Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, NY 10004-1408.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of shares of common stock of the Debtor held by the objector. Any such objection must be filed with the Court and served so that it is received by the Court and the following parties on or before October 11 at 5:00 p.m. Eastern Standard Time:

Herrick, Feinstein LLP
Attorneys for the Debtor
2 Park Avenue
New York, New York 10016
Attn:  Joshua J. Angel

Frederick E. Schmidt, Jr.
Justin B. Singer

-and-

Silverman Acampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Tel. No. (516) 479-6300
Attn:   Adam Rosen

-and-

Richard Morrissey, Esq.
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the

Bankruptcy Court.

### C.    Confirmation

At the Confirmation Hearing, the Court will confirm the Plan only if all of the
requirements of section 1129 of the Bankruptcy Code are met.   Among the requirements for
confirmation of the Plan are that the Plan is (i) accepted by all impaired Classes of Claims and
Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate
unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests"
of creditors and stockholders that are impaired under the Plan.

1.       **Acceptance**

Classes 2 and 3 of the Plan are impaired under the Plan.  Class 5 is presumed to have rejected the Plan.  Class 1 of the Plan is unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan.  Class 4 of the Plan is comprised of insiders of the Debtor and is deemed to have accepted the Plan.

2.       **Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its financial obligations as contemplated thereunder.  As part of this analysis, the Debtor has prepared projections set forth in Exhibit C hereto.  Based upon the projections, the Debtor believes it will be able to make all payments required to be made pursuant to the Plan.

3.       **Best Interests Test**

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims and Equity Interests of each impaired Class would receive if the Debtor was liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case.  The cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor,

augmented by the unencumbered cash held by the Debtor at the time of the commencement of the liquidation case.  Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative expense and priority claims that might result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and Executory Contracts assumed or entered into by the Debtor during the pendency of this Chapter 11 Case.  The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Debtor and the Creditors' Committee during this Chapter 11 Case such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition Claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtor's unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

The Debtor has determined that a Chapter 7 liquidation would be detrimental to its creditors and, as set forth below, would not provide <u>any</u> recovery for general unsecured creditors. After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds

available for distribution to creditors in this Chapter 11 Case, including (i) the limited amount of assets held by the Debtor that could be used to generate value for the Debtor's Estate, (ii) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (iii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail and (iv) the potential increases in Claims which would be satisfied on a priority basis or on parity with creditors in this Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7.

The Debtor's Liquidation Analysis is attached hereto as part of Exhibit D.  The information set forth in Exhibit D provides a summary of the liquidation values of the Debtor's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's Estate.  The Liquidation Analysis was prepared by the Debtor's CRO, John Dunne.

As the Liquidation Analysis demonstrates, the anticipated amount of Cash that a Chapter 7 liquidation of the Debtor would realize is approximately $988,397.  Even assuming that the GECC secured claim in the approximate amount of $6.7 million[4] is paid in full by the Selling Affiliates from the proceeds of the sale of their assets, there would still be insufficient Cash to make any distribution to holders of general Unsecured Claims after making required distributions to holders of Secured Claims and Administrative Expense Claims. Indeed, there would be insufficient funds to even pay Administrative Expense Claims in full.

---

[4] GECC filed a proof of claim in the amount of $6,683,907.94.  The Debtor reserves all rights to object to GECC's claim.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management.  The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected might not be realized if the Debtor was, in fact, to undergo such a liquidation.

**VIII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization.

**A.      Liquidation Under Chapter 7**

If no plan is confirmed, this Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be selected to liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7.  As discussed previously in Section VII.C.3, the Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Plan because (a) the Debtor holds a limited amount of assets that could be used to generate value for the Debtor's Estate, (b) the Debtor's assets would have to be sold or otherwise disposed of in a forced sale situation over a short period of time, (c) additional administrative expenses would be involved in the appointment of a trustee, and (d) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtor's operations.

**B.      Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtor or other persons could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of its assets.

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR AND INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The Plan envisions that the Cash required for its consummation will be generated from the Asset Sale and the Debtor's continuing operations. The ability of the Debtor in conjunction with the Selling Affiliates to close the Asset Sale, and execute on its business plan are key to the Plan's consummation. That assumed ability is summarized in its projections attached as Exhibit C to the Disclosure Statement. The Debtor believes that these projections reflect a reasonable evaluation of its future business and are based upon past performance and conservative assumptions as to future trends. Nevertheless, assumptions as to future economic and business trends are subject to inherent uncertainties. The risk factors include general economic conditions, the ability to close the Asset Sale and increased competition in the Debtor's restaurant and catering operations. Despite these uncertainties, the projections are premised on feasible and attainable goals with modest same store sales growth and lower gross margins,

61

among the key assumptions.  (A more detailed description of the feasibility of the Plan is contained in Section VII.C.2.)

### A.    Certain Bankruptcy Law Considerations

#### 1.    Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

#### 2.    Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that all of the conditions to the Effective Date will occur after the entry of the Confirmation Order, there can be no assurance as to the timing of the Effective Date or that such conditions will ever occur.

### B.    Certain Tax Matters

For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtor, see Article XI, "Certain Federal Income Tax Consequences Of The Plan."

### C.    Additional Factors to be Considered

#### 1.    Risk of Economic Deterioration

In the event that economic conditions in general and in the high-end steak restaurant and catering industries specifically decline suddenly and precipitously, the Debtor could potentially be unable to operate its business.  In addition, a further tightening of the credit markets could prevent a successful restructuring.  Under such circumstances, the Debtor will not be able to confirm the Plan.

### 2.    The Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside This Disclosure Settlement Are Authorized

No representations concerning or related to the Debtor, this Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 4.    Claims Could Be More Than Projected

Although the Bar Date for filing proofs of Claim occurred on May 3, 2011 for non-governmental units, and May 16, 2011 for governmental units, the Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.

### 5.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be

considered assurance or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 6.    No Legal or Tax Advice is Provided to You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 7.    No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of Claims or Equity Interests.

## X.
## SECURITIES LAWS MATTERS

No registration statement will be filed under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws with respect to the offer and distribution under the Plan of the Reorganized Debtor's membership interests (sometimes referred to as the "Plan Securities"). The Debtor believes that the provisions of section 1145(a)(1) exempt the offer and distribution of the Plan Securities to the Equity Interest holders from federal and state securities registration requirements.

### A.    Bankruptcy Code Exemptions from Registration Requirements

### 1.    Initial Offer and Sale of Plan Securities

Section 1145(a)(1) of the Bankruptcy Code exempts, to the extent that an entity is not an underwriter as defined under section 1145(b) of the Bankruptcy Code, the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. The Debtor believes that it is not an underwriter as defined under section 1145(b) of the Bankruptcy Code and the offer and sale of the Plan Securities under the Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

## XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor, holders of certain claims against the Debtor and holders of existing Equity Interests in The Glazier Group, Inc. (the "Holdco"). This discussion does not address the U.S. federal income tax consequences of the implementation of the Plan to holders of claims that are entitled to reinstatement, unimpaired (for example, holder of the Priority Non-Tax Claims) or otherwise entitled to payment in full in cash under the Plan.

The discussion of U.S. federal income tax consequences set forth below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Department of Treasury regulations promulgated or proposed thereunder, judicial authorities, published positions of the

Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as specifically stated otherwise, this summary assumes that a holder holds a claim or an existing Equity Interest as a capital asset for U.S. federal income tax purposes. This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.,* foreign persons or entities, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold claims or existing Equity Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding claims or existing Equity Interests as a hedge against, or that is hedged against, currency risk or as part of a straddle, constructive sale or conversion transaction).

The discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration issued pursuant to the Plan through means other than directly participating in the exchange. If a partnership (or another entity that is

treated as a partnership for U.S. federal income tax purposes) holds claims or existing Equity Interests, the tax treatment of a partner (or other equity owner) generally will depend upon the status of such partner (or other owner) and upon the activities of the partnership (or other entity). This discussion is based on currently available information regarding the Plan terms and may not reflect the actual terms of the Plan upon its implementation.  The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of claims or existing Equity Interests.

**IRS Circular 230 Notice**:  To ensure compliance with IRS Circular 230, holders of claims and existing Equity Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by such holders for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (C) such holders should seek advice based on their particular circumstances from independent tax advisors.

### A.    Consequences to the Debtor

The Plan, as currently contemplated, may result in income tax consequences to the Debtor's Equity Holders in connection with the Asset Sale.  Such tax, if any, would flow to the Equity Holders pursuant to the Debtor's status as an S Corporation and the filing of tax returns by the Equity Holders reflecting the result of the joint operations of the Debtor and the Restaurant Affiliates.

### B.    Consequences to Claim Holders

A Claim holder that receives money or other property in discharge of a Claim for interest accrued during the period the holder owned such Claim and not previously included in such holder's income will be required to recognize ordinary income equal to the amount of such money and the fair market value of such property received in respect of such Claim.  A holder generally may claim an ordinary deduction (or, possibly, a write-off against a reserve for bad debts) to the extent of any Claim for accrued interest that was previously included in such holder's taxable income and which will not be paid in full by the Debtors under the Plan (after allocating any payment to be made by the Debtors between principal and accrued interest), even if the underlying Claim is held as a capital asset.  The tax basis of any property received in exchange for a Claim for accrued interest under the Plan will equal the fair market value of such property on the Effective Date, and the holding period for such property will begin on the day following the Effective Date.

The extent to which consideration distributable under the Plan is allocable to interest is unknown.  Holders of Claims are advised to consult their own tax advisers to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR EXISTING EQUITY INTERESTS PARTICIPATING IN THE EXCHANGE UNDER THE PLAN ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE TO THEM.**

## XII.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently,

the Debtor urges all eligible holders of Impaired Claims and Interests to vote to **accept** the Plan,

and to complete and return their ballots so that they will be **received** by the Balloting Agent on

or before 5:00 p.m. (Eastern Time) on October 11, 2011.

Dated: September 8, 2011

Respectfully Submitted,

THE GLAZIER GROUP, INC.

By:     /s/ John Dunne
Title:   Chief Restructuring Officer